# United States District Court
# Central District of California

| | |
|---|---|
| KEVIN SHAW, an individual,<br><br>                    Plaintiff,<br><br>          v.<br><br>KATHLEEN F. BURKE, in her individual and official capacities; EARIC DIXON-PETERS, in his individual and official capacities; WILLIAM A. MARMOLEGO, in his individual and official capacities; JUAN C. ASTORGA, in his individual and official capacities; FRANCISCO C. RODRIGUEZ, in his official capacity; SCOTT J. SVONKIN, in his official capacity; SYDNEY K. KAMLAGER, in his official capacity; MIKE FONG, in his official capacity; MIKE ENG, in his official capacity; ANDRA HOFFMAN, in her official capacity; ERNEST H. MORENO, in his official capacity; NANCY PEARLMAN, in her official capacity, and JOHN DOE, in his individual and official capacities,<br><br>                    Defendants. | Case № 2:17-CV-02386-ODW (PLAx)<br><br>**ORDER DENYING, IN PART, AND GRANTING, IN PART, DEFENDANTS' MOTION TO DISMISS, OR, IN THE ALTERNATIVE, FOR A MORE DEFINITE STATEMENT [22]** |

## I.    INTRODUCTION

Kevin Shaw filed his Complaint on March 28, 2017, and seeks an injunction, declaratory relief, and damages for alleged violations of his First Amendment rights, while a student at Los Angeles Pierce College ("Pierce"). (Compl., ECF No. 1.)  He

asserts five causes of action pursuant to 28 U.S.C. § 1983, and a sixth for declaratory relief. Defendants Kathleen F. Burke, Earic Dixon-Peters, William A. Marmolejo, Juan C. Astorga, Francisco C. Rodriguez, Scott J. Svonkin, Sydney K. Kamlager, Mike Fong, Mike Eng, Andra Hoffman, Ernest H. Moreno, and Nancy Pearlman ("Defendants") moved to dismiss Shaw's Complaint on May 24, 2017, arguing that: 1) Shaw's claims are barred by the Eleventh Amendment; 2) Shaw has no standing to bring the claims; 3) certain defendants are entitled to qualified immunity; and 4) Shaw fails to state a claim. (Mot., ECF No. 22.)

On October 24, 2017, the United States filed a Statement of Interest, pursuant to 28 U.S.C. § 517, arguing that Shaw has sufficiently pleaded a claim under the First Amendment, but declining to opine on the remaining issues. (Statement of Interest, ECF No. 39.) Defendants opposed the United States' brief, and the Court later allowed the United States to file a Supplemental Statement of Interest in response. (Supp. Statement of Interest, ECF No. 44.) After considering the papers filed in connection with the Motion, the Court deemed the matter appropriate for decision without oral argument. Fed. R. Civ. P. 78(b); C.D. Cal. L.R. 7-15. Accordingly, the Court **DENIES, in part, and GRANTS, in part,** Defendants' Motion for the reasons set forth below.

## II. FACTUAL BACKGROUND[1]

Shaw attends Pierce, which is one of nine community colleges within the Los Angeles Community College District (the "District"). (Compl. ¶¶ 1, 3, 14, 28.) Shaw brings facial and as-applied challenges to the District and Pierce's published and unpublished speech policies.

### A. The Speech Policies

Chapter IX, Article IX of the District's Rules governs freedom of speech on campuses within the District. (*Id.* ¶¶ 31–34.) Some of the rules at issue here include:

---

[1] All factual references are allegations taken from Shaw's Complaint and accepted as true for purposes of this Motion. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

- Rule 9901, which establishes all of the District's campuses as non-public fora that are not open to free speech and expression, except for designated "Free Speech Areas," (*Id.* ¶ 35, Ex. A, pg. 31);

- Rule 9902.11, which provides that students may distribute literature, including "petitions, circulars, leaflets, newspapers, miscellaneous printed matter and other materials" *only* in Free Speech Areas, (*Id.* ¶ 37, Ex. A, pg. 31);

- Rule 9902.13, which allows each college president to designate "Free Speech Areas" on campus "for free discussion and expression by all persons," subject to content-neutral time, place, and manner restrictions, including "reasonable time restrictions on the use of Free Speech Areas," (*Id.* ¶ 38, Ex. A, pg. 32);

- Rule 9904, which provides that student use of areas not designated as "Free Speech Areas" for expressive activities "shall be governed by the rules and regulations established pursuant to Article X, relating to student activities and events," (*Id.*, Ex. A, pg. 34); and

- Rule 91005, Article X, which provides that "the college president shall not approve any rules relating to non-Free Speech Areas which would deny students their free speech rights were they conducting such activities in Free Speech Areas." (Defendants' Request for Judicial Notice, Ex. 1, ECF No. 23-1.)[2]

Pierce requires students to obtain a permit prior to using the Free Speech Area. (*Id.* ¶ 4.) Shaw claims this "unpublished requirement…severely restrict[s] free speech and expressive activity." (*Id.*) The permit contains additional rules and regulations that are only available by requesting and obtaining a permit. (*Id.* ¶¶ 43–44, Ex. C.)

---

[2] Shaw does not oppose Defendants' Request for Judicial Notice, and addresses the contents of the District's Board Rules in his Opposition. (Opp'n 18, ECF No. 33.) The Court takes judicial notice of the District's Board Rules, Chapter IX, Article X. *Esquivel v. San Francisco Unified Sch. Dist.*, 630 F. Supp. 2d 1055, 1057 n.2 (N.D. Cal. 2008) (taking judicial notice of school board policy).

As described further below, Shaw first became aware of this requirement after a school administrator, sued here as John Doe, advised him that he was not permitted to engage in free speech outside of the Free Speech Area, and that he needed to complete a permit application prior to doing so. (*Id.* ¶ 60.) Because Pierce does not publish its free speech rules and regulations, "[s]tudents…have no public, generally accessible means to discern any restrictions to which they are subject or under which they could be punished for engaging in speech or expressive activity on Pierce College's campus." (*Id.* ¶ 40.)

Upon receiving the permit application, students discover that:

- "The college has one (1) Free Speech Area" on campus "designated for free speech and gathering of signatures," (*Id.* ¶ 40, Ex. C, pgs. 36–37);

- "Individuals planning to distribute material on campus are required to go to the Vice President of Student Services Office located on the third floor of the Student Services Building between the hours of 9:00 a.m. and 4:00 p.m." (*Id.*, Ex. C, pg. 36);

- Students must identify the name and address of the organization they represent, the name(s) of the distributor(s), and the date and time of the distribution, (*Id.* ¶ 48, Ex. C, pg. 36); and

- "[D]istribution [of materials] shall take place only within the geographical limits of the Free Speech Area," and students may only use the Free Speech Area from 9:00 a.m. until 7:30 p.m., Monday through Friday. (*Id.* ¶¶ 36–37, Ex. C, pg. 37.)

Shaw claims that, "[o]n its face, the Pierce College Free Speech Area Policy does not limit the discretion of the Vice President of Student Services Office, or other administrators responsible for its enforcement, to deny or approve the application because of the content or viewpoint of the speaker's intended message." (*Id.* ¶ 50.) The Free Speech Area also prohibits "spontaneous or anonymous speech because

individuals must fill out an application for the use of the space and identify themselves and their organization prior to accessing it. (*Id.* ¶ 51.)

The Free Speech Area is identified on an attachment to Pierce's Free Speech Area Policy, which is a map that has an area "on the Mall within…red and black dotted lines[, and] is approximately 616 square feet, comprising approximately .003% of the total area of Pierce College's 426 acres, and approximately .007% of the main area of campus…, which excludes the approximately 226-acre farm dedicated to Pierce's agricultural…programs." (*Id.* ¶ 46, Exs. B, C.) Shaw alleges that the limited size of the Free Speech Area is not tied to any legitimate interest because Pierce "has many open areas and sidewalks beyond the Free Speech Area where student speech, expressive activity, and distribution of literature would not interfere with or disturb access to college buildings or sidewalks, impede vehicular or pedestrian traffic, or in any way substantially disrupt [Pierce's] operations…." (*Id.* ¶ 54.)

Pierce enforces these rules through its Standards of Student Conduct, which it prints in its schedule of classes. (*Id.* ¶ 55.) A violation of Pierce's rules, or District Rule 9803.11, which prohibits a "[v]iolation of college rules and regulations including those concerning student organizations, the use of college facilities, or the time, place, and manner of public expression or distribution of materials," may result in discipline. (*Id.*)

**B.     The Policies Applied to Shaw**

In addition to being facially unconstitutional, Shaw alleges that Pierce enforces its rules in a way that restricts free speech. On November 2, 2016, Shaw and two other members of the Young Americans for Liberty organization attempted to distribute Spanish-language copies of the United States Constitution and discuss freedom of speech issues with students on Pierce's campus. (*Id.* ¶ 56.) Shaw and his cohort set up a small folding table near the "Mall" area of campus, but outside of the Free Speech Area. (*Id.* ¶ 57.) Shortly afterward, a college administrator advised them that they were violating Pierce's free speech policies, and would need to obtain a

permit to continue distributing their materials and interacting with students. (*Id.* ¶¶ 59–60.) Shaw asked what would happen if he did not follow the administrator to obtain the permit, and the administrator said that he would ask Shaw and the others to leave campus. (*Id.* ¶ 61.) So, Shaw followed the administrator to the office, and filled out the permit application, which included the Pierce College Free Speech Area Policy, which Shaw had now seen for the first time. (*Id.* ¶ 62, Ex. B.) Despite his request, the administrator refused to provide Shaw with a copy of the completed permit application. (*Id.* ¶ 63.)

On November 11, 2016, Shaw emailed Astorga, the Dean of Student Engagement, and informed him that he wanted to gather signatures and encourage students to adopt a different free speech policy in an area outside of the Free Speech Area, but away from buildings and in an area that would not impede pedestrian traffic. (*Id.* ¶¶ 18, 64–65.) Shaw also confirmed that he would not use any amplified sound. (*Id.* ¶ 65.) It is unclear from the Complaint whether Astorga responded.

On November 16, 2016, Shaw distributed materials outside the Free Speech Area "for several hours in an open, grassy area of campus" without encountering any administrators. (*Id.* ¶ 66.) He also observed a "large protest that formed outside of the Free Speech Area to protest the election of then-President-Elect Donald Trump." (*Id.*) This, he claims, evidences Pierce's selective and uneven enforcement of its free speech policies. (*Id.* ¶ 67.)

Through the rest of November and December 2016, Shaw attempted on several occasions to obtain a copy of his signed permit application. (*Id.* ¶¶ 68–85.) After several rebuffed attempts and correspondence between Shaw and Pierce administrators who are named Defendants, on December 8, 2016, Geremy Mason, a senior secretary in the Associated Student Organization ("ASO") Office, provided Shaw with a copy of his application. (*Id.*)

Now, Shaw wants to continue gathering signatures, and expressing himself on Pierce's campus, without being confined to the small Free Speech Area. (*Id.* ¶ 88.)

However, he is afraid to do so because he could run into an administrator who would discipline him for violating the Standards of Student Conduct or "contact the sheriff's office to remove him from campus." (*Id.*)

### III. LEGAL STANDARD

A court may dismiss a complaint under Rule 12(b)(6) for lack of a cognizable legal theory or insufficient facts pleaded to support an otherwise cognizable legal theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988). A court may also dismiss a complaint for lack of subject matter jurisdiction, pursuant to Rule 12(b)(1).

To survive a motion to dismiss, a complaint need only satisfy the minimal notice pleading requirements of Rule 8(a)(2)—a short and plain statement of the claim. *Porter v. Jones*, 319 F.3d 483, 494 (9th Cir. 2003). The factual "allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). That is, the complaint must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). These factual allegations must provide fair notice and enable the opposing party to defend itself effectively. *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).

The determination whether a complaint satisfies the plausibility standard is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. A court is generally limited to the pleadings and must construe all "factual allegations set forth in the complaint . . . as true and . . . in the light most favorable" to the plaintiff. *Lee v. City of L.A.*, 250 F.3d 668, 688 (9th Cir. 2001). But a court need not blindly accept conclusory allegations, unwarranted deductions of fact, and unreasonable inferences. *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).

If a pleading is so vague and ambiguous that a party cannot reasonably prepare a response, the party may ask for a more definite statement of the pleading. Fed. R.

Civ. P. 12(e). This request must be made before a response is filed, and it must explain the defects of the complaint. *Id.* If the pleading party fails to provide this statement, the court may strike the pleading. *Id.*

## IV. DISCUSSION

Defendants move to dismiss on the grounds that: 1) Shaw does not have standing; 2) he fails to state any claims on which relief could be granted; 3) his Second Third, Fourth, and Fifth Causes of Action against Defendants Burke, Marmolejo, Dixon-Peters, and Astorga (the "Pierce Defendants") fail to state claims for individual liability; 4) the Pierce Defendants are entitled to qualified immunity; and 5) Eleventh Amendment immunity bars all claims for monetary damages against Defendants in their official capacities.

### A. Shaw Alleges Facts Establishing Standing

"Constitutional challenges based on the First Amendment present unique standing considerations." *Arizona Right to Life Political Action Comm. v. Bayless*, 320 F.3d 1002, 1006 (9th Cir. 2003). Thus, in order to "avoid the chilling effect of sweeping restrictions, the Supreme Court has endorsed what might be called a 'hold your tongue and challenge now' approach rather than requiring litigants to speak first and take their chances with the consequences." *Id.* (citing *Dombrowski v. Pfister*, 380 U.S. 479, 486 (1965)). Generally, standing requires an "injury in fact," causation, and that the injury may be redressed by a favorable decision by the court. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–62 (1992). A plaintiff's alleged harm qualifies as an "injury in fact" where the defendant's actions invade a legally protected interest that is: "(a) concrete and particularized; and (b) 'actual or imminent, not 'conjectural' or 'hypothetical.'"" *Id.* at 560 (citations omitted). Here, Shaw challenges Pierce's free speech policies, both facially, and as applied.

#### 1. As applied

As applied, Shaw alleges that Defendants restricted his speech when Pierce administrators enforced Pierce's Free Speech Policy, and required him to obtain a

permit before continuing to distribute Spanish-language copies of the U.S. Constitution. (Compl. ¶¶ 56–62). This sufficiently establishes his standing because he demonstrates a concrete injury, traceable to Defendants' conduct that could be redressed by a favorable ruling. *See, e.g.*, *Preminger v. Peake*, 552 F.3d 757, 764 (9th Cir. 2008) (holding plaintiff had direct standing to bring an as-applied challenge where defendant interrupted plaintiff's registration of voters within defendant's facility).

### 2. *Facial challenge*

With respect to Shaw's facial challenge, Defendants claim Shaw does not establish how his "rights have been violated or are immediately threatened by specific provisions of the District Free Speech Policy and actions of the members of the Board of Trustees," as opposed to the Pierce Defendants. (Mot. 7) Shaw alleges, however, that Pierce developed its Free Speech Policies, which have already restricted his speech (Compl. ¶¶ 56–62), in accordance with the District's directive that college campuses are non-public fora, and that the colleges designate specific free speech areas. (*Id.* ¶¶ 2–3, 29–39.) Defendants also argue that Shaw does not have standing because he cannot demonstrate Pierce is likely to enforce the free speech policies. (Mot. 7–10.)

When evaluating a pre-enforcement plaintiff's standing, courts consider "whether [a plaintiff] ha[s] failed to show a reasonable likelihood that the government will enforce the challenged law…." *Lopez v. Candaele*, 630 F.3d 775, 786 (2010). Next, a plaintiff must establish, "with some degree of concrete detail, that they intend to violate the challenged law," and that the law applies to them. *Id.* "[P]ast enforcement against the same conduct is good evidence that the threat of enforcement is not "'chimerical.'" *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2345 (2014) (quoting *Steffel v. Thompson*, 415 U.S. 452, 459 (1974)). Defendants argue that because college officials did not restrict Shaw's expressive activity on November 16, 2016, or the anti-Trump protestors' activity, the threat of future enforcement is

low. (Mot. 9.) This, however, does not negate the fact that college administrators interrupted Shaw's expressive activity on November 2, 2016, pursuant to the challenged policies, nor the fact that Pierce also indicates it will enforce its Free Speech Policies through its Standards of Student Conduct, which can result in disciplinary action. (Compl. ¶¶ 55–63); *Libertarian Party of Los Angeles Cty. v. Bowen*, 709 F.3d 867, 871 (9th Cir. 2013) (holding threat of enforcement requirement satisfied where defendant posted challenged regulation on website). Accordingly, Shaw sufficiently alleges threat of future enforcement.

Further, Shaw adequately describes that he intends to violate the challenged policies. *Lopez*, 630 F.3d at 786. He sets forth the conduct that originally subjected him to enforcement of the policy, a second episode, where Pierce did not enforce the policy, or, at least, did not catch him violating it, and that he intends to continue doing so in the future. (Compl. ¶¶ 56–66, 74, 88.) Astorga also specifically told Shaw that he should see him "next time [Shaw] would like to distribute any materials" so that Astorga could provide the appropriate paperwork. (*Id.* ¶ 74.) At this stage, Shaw sufficiently pleaded his intent to continue engaging in protected activity, such that the Court is not required to conjure hypotheticals that may lead to enforcement of the policies in the distant future.

Finally, a favorable ruling will redress Shaw's injury because he will be able to engage in free speech activities without discipline, interruption from college authorities, or the chilling effect accompanying the threat of discipline. *Khademi v. South Orange Cty. Cmty. College Dist.*, 194 F. Supp. 2d 1011, 1019 (C.D. Cal. 2002) (holding that favorable ruling would redress harm where regulation at issue "could possibly prevent Plaintiffs from engaging in certain constitutionally protected activities, restrict their manner of expression, and/or expose them to disciplinary action for engaging in certain protected activities").

**B.      Failure to State a Claim: First Amendment Issues**

Defendants argue that Shaw fails to state a claim under the First Amendment. (Mot. 11.)   The extent to which the government may regulate speech at a school largely depends on how the area at issue is characterized.   Courts traditionally categorize property as either (1) a public forum, (2) a designated public forum, or (3) a non-public forum.  *Perry Educ. Ass'n v. Perry Local Educs. Ass'n*, 460 U.S. 37, 45–46 (1983).  With each of these monikers comes a different standard of review.  Shaw contends that Defendants' regulations violate the First Amendment in at least two ways: 1) Defendants' limitation of speech to only the Free Speech Area is not a reasonable time, place, or manner restriction; and 2) despite designating a Free Speech Area, Defendants' permitting requirement is an unconstitutional prior restraint. (*See* Opp'n, Section C.)

*1.      Type of Forum*

"The college classroom with its surrounding environs is peculiarly 'the marketplace of ideas.'"  *Healy v. James*, 408 U.S. 169, 180 (1972).  However, simply because the government owns property does not automatically mean that any individual may use it to express his or her First Amendment rights.  *Grayned v. City of Rockford*, 408 U.S. 104, 117–118 (1972) ("Nowhere [have we] suggested that students, teachers, or anyone else has an absolute constitutional right to use all parts of a school building or its immediate environs for…unlimited expressive purposes.").

Traditional public fora are places, such as public sidewalks or parks, where individuals have long been able to freely express their ideas.  *Perry*, 460 U.S. at 45. In public fora, the government may not completely restrict speech.  *Id.*  "[T]o enforce a content-based exclusion[, the government] must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end."  *Id.* (citing *Carey v. Brown*, 447 U.S. 455, 461 (1980)).  Where a regulation is content-neutral, the government may establish reasonable time, place, and manner restrictions, which are narrowly tailored to achieve a significant government interest, so long as

there are ample alternative channels of communication. *Id.* (citing *United States Postal Serv. v. Council of Greenburgh*, 453 U.S. 114, 132 (1981)); *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).

Even in places that are not traditionally regarded as a public forum, the government may designate the area as an area for free discourse, which renders it a designated public forum. *Perry*, 460 U.S. at 45–46. While not required to maintain the area open for expression forever, during the period the government maintains the area as an area for free expression, its regulations are subject to the same level of scrutiny as those employed in a traditional public forum. *Id.* at 46 (citing *Widmar v. Vincent*, 454 U.S. 263, 269–270 (1981)) ("Reasonable time, place and manner regulations are permissible, and a content-based prohibition must be narrowly drawn to effectuate a compelling state interest."). While not entirely settled,[3] a sub-category of the "designated public forum" is the "limited public forum." *Good News Club v. Milford Central Sch.*, 533 U.S. 98, 106–07 (2001); *OSU Student Alliance v. Ray*, 699 F.3d 1053, 1062 (9th Cir. 2012) (quoting *Flint v. Dennison*, 488 F.3d 816, 830–31 (9th Cir. 2007)). A limited forum occurs where the government opens a non-public forum to certain types of speech. *OSU Student Alliance*, 699 F.3d at 1062. In a limited public forum, the government may regulate speech as long as the regulations: "(1) comport with the definition of the forum (for example, the government cannot exclude election speech from a forum that it has opened specifically for election speech); (2) are reasonable in light of the purpose of the forum; and (3) do not discriminate by viewpoint." *Id.* at 1062.

The final category, non-public fora, includes public property that "is not by tradition or designation a forum for public communication…." *Id.* The government may impose time, place, and manner restrictions, and "the state may reserve the forum

---

[3] The Ninth Circuit has explained that "[t]he contours of the terms 'designated public forum' and 'limited public forum' have not always been clear." *Hopper v. City of Pasco*, 241 F.3d 1067, 1074 (9th Cir. 2001) (citing *DiLoreto v. Downey Unified Sch. Dist. Bd. of Educ.*, 196 F.3d 958, 965 n.4 (1999)).

for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Perry*, 460 U.S. at 46.

Shaw maintains that Pierce's entire campus is a traditional public forum, or, at least, a designated public forum. (Opp'n 10–11.) Defendants claim that the California community colleges are not public fora because their "primary mission" is to "provide academic and vocational education to younger and older students." (Mot. 13.) Defendants also rely on the District Board Rules, which declare its campuses to be non-public fora, except the Free Speech Area, which Defendants claim is a limited public forum. (*Id.*, Compl. ¶ 35, Ex. A, pg. 30.) On the other hand, Shaw argues that California Education Code section 76120 affirmatively designates community college campuses as public fora. (Opp'n 11.)

Section 76120 provides that the rules implemented by the governing board of a community college:

> shall not prohibit the right of students to exercise free expression…except that expression which is obscene, libelous or slanderous according to current legal standards, or which so incites students as to create a clear and present danger of the commission of unlawful acts on [campus], or the violation of lawful community college regulations, or the substantial disruption of the orderly operation of the community college, shall be prohibited.

Cal. Educ. Code § 76120. Shaw analogizes this statute to the one at issue in *OSU Alliance v. Ray*, where the Ninth Circuit held that an Oregon state regulation that opened universities for speech activities, with the exception of certain areas marked authorized access only, indicated that the campus was "at least a designated public forum." *OSU Alliance*, 699 F.3d at 1062. While the Section 76120 evinces an intent of the California legislature to open community college campuses to "the right of students to exercise free expression," it also explicitly excludes expression that is in "violation of lawful community college regulations." Cal. Educ. Code § 76120. The

District's regulations here seem to be at odds with the spirit of Section 76120. Because Section 76120 excludes activities that violate "lawful community college regulations," and Defendants claim Shaw's actions violate Pierce's regulations, the Court must evaluate the nature of the property Shaw seeks to use in categorizing it.

"[T]he intent of a government to create a nonpublic forum has no direct bearing upon traditional public forum status." *ACLU of Nevada v. City of Las Vegas*, 333 F.3d 1092, 1104 (9th Cir. 2003). Instead, in evaluating whether an area is a traditional public forum, courts evaluate:

> 1) the actual use and purposes of the property, particularly status as a public thoroughfare and availability of free public access to the area; 2) the area's physical characteristics, including its location and the existence of clear boundaries delimiting the area; and 3) traditional or historic use of both the property in question and other similar properties.

*Id.* at 1100. The Court must also keep in mind that "[a] modern university contains a variety of fora." *Bowman v. White*, 444 F.3d 967, 976 (8th Cir. 2006).

On Pierce's campus, there are "open areas and sidewalks beyond the Free Speech Area where student speech, expressive activity, and distribution of literature would not interfere with or disturb access to college building or sidewalks…." (Compl. ¶ 54.) At the time administrators stopped Shaw from distributing Spanish-language copies of the U.S. Constitution, he was alongside a "large thoroughfare called 'the Mall'" and was not "disrupting campus operations or interfering with foot traffic." (*Id.* ¶¶ 57–58.) These facts tend to establish the open areas of Pierce's campus are a public forum.

In *Widmar v. Vincent*, the Supreme Court noted in a footnote that "the campus of a public university, at least for its students, possesses many of the characteristics of a public forum." 454 U.S. at 267 n.5 (citing *Police Dept. of Chicago v. Mosley*, 408 U.S. 92 (1972) and *Cox v. Louisiana*, 379 U.S. 536 (1965)). This characterization makes sense, because after all, what is a university's purpose but to expose students to new ideas and spark dialogue? However, the Supreme Court recognized, that a

university's first priority is education and that any First Amendment analysis must consider this purpose. *Id.* All this means, however, is that a campus need not "make all of its facilities equally available to students and nonstudents alike," nor "grant free access to all of its grounds or buildings." *Id.* Given the traditional purpose of the open, outdoor areas of universities, such as the "Mall" on Pierce's campus, the Court finds that these areas are traditional public fora, regardless of Pierce's regulations naming them non-public fora. *Id.*; *Bowman*, 444 F.3d at 979 ("College campuses traditionally and historically serve as places specifically designated for the free exchange of ideas."). This does not eviscerate Defendants' ability to regulate speech in these areas with reasonable time, place, and manner restrictions, narrowly tailored to serve their interests; it simply limits their ability to create content-based restrictions. *See OSU Student Alliance*, 699 F.3d at 1062–63 (permitting content-based, viewpoint neutral restrictions in non-public or limited fora).

In distinguishing the legal authority cited by Shaw and the United States, Defendants argue that there should be some distinction between Pierce and "public universities." (Reply 8, ECF No. 35.) According to Defendants, because Pierce is a community college, and not a "public university," the cases finding that open areas are traditional public fora are not applicable. (*Id.*) Simply because a community college attracts students who are more likely to commute and less likely to live on campus, does not mean that community college students should be precluded from expressing themselves in traditionally free, open areas such as the Mall on Pierce's campus. One would hope that community colleges strive to provide a certain caliber of education, with which also comes the opportunity to express oneself in the same manner as a student at a "public university." Accordingly, the Court does not find this argument persuasive.

Defendants also criticize Shaw for ignoring Board Rule 9903 in his Complaint. (Reply 2.) Board Rule 9903 provides: "The president of each college may designate areas outside of the Free Speech Areas where students…may exercise freedom of

expression subject only to reasonable time, place and matter restrictions." (Compl., Ex. A, pg. 33.) This Rule shows that the District contemplated designating areas outside of the Free Speech Area as public fora. The Rule allows the college president to determine where to designate additional areas of expression, given the unique considerations applicable to a specific campus layout, i.e. location of classrooms vis-à-vis open spaces or thoroughfares. This supports a finding that the District designated, or at least provided authority to designate, certain areas of Pierce's campus outside of the Free Speech Area as public fora. Indeed, Shaw alleges that he and others engaged in expressive activity outside of the Free Speech Area on other occasions, despite the policies prohibiting such conduct. (Compl. ¶ 66.) These actions, if proven true, could also nullify the policies declaring the entire campus a non-public forum. *See OSU Student Alliance*, 699 F.3d at 1063 (holding that university must consistently apply policies designed to establish an area as a non-public forum). In any event, the scrutiny the Court applies to regulations governing public or designated fora is the same. *Perry*, 460 U.S. at 45–46. Thus, the Court must evaluate the nature of Defendants' policies. *Id.*

2. *Significant interests and avenues of communication*

The parties do not dispute that Defendants have a significant interest in "avoiding disruption, insuring safety, comfort, or convenience of the public, and maintaining grounds that are attractive and intact…." (Opp'n 16.) The question is whether Defendants narrowly tailored their regulations, and whether students have alternate avenues of communication. *Perry*, 460 U.S. at 45–46.

"The requirement of narrow tailoring means that a time, place or manner restriction on First Amendment activity may not 'burden substantially more speech than is necessary to further the government's legitimate interests.'" *Grossman v. City of Portland*, 33 F.3d 1200, 1205 (9th Cir. 1994) (quoting *Ward*, 491 U.S. at 799). Defendants argue their regulations are narrowly tailored because without designating free speech areas, students "would be able to congregate on walkways outside of

doors and buildings, compete for use of college grounds, create safety and sanitation issues, and impose even greater administrative burdens…." (Mot. 14.) However, Defendants' literally "narrow" free speech area, comprising 616 square feet on a campus spanning hundreds of acres (Compl. ¶ 46), does not achieve Defendants' stated goals without unnecessarily impeding students' First Amendment rights. *See Kuba v. 1-A Agric. Ass'n*, 387 F.3d 850, 862 (9th Cir. 2004) (citations omitted) (holding that a policy that "relegates communication activity to three small, fairly peripheral areas, does not sufficiently match the stated interest of preventing congestion and so is not narrowly tailored"). There are ample ways for Defendants to achieve their stated goals without precluding so much protected speech: Defendants could limit expression to areas away from classrooms or impose restrictions on the time students are able to express themselves. Instead, Defendants preclude all speech in substantial portions of the campus, such as the Mall, without any discernable connection to their stated interests. Accordingly, Shaw sufficiently alleges that Defendants' regulations are not narrowly tailored.

Defendants must also leave open alternative channels of communication. *Perry*, 460 U.S. at 45–46. Defendants argue that because the free speech area must be in a place "where there is a normal flow of student traffic with unlimited accessibility" (Compl. ¶ 36), students are provided "extensive access to their intended audience." (Mot. 15.) Because the one place Pierce allows expressive activity to occur is centralized does not detract from the fact that Defendants ostensibly close all other channels of communication outside of the Free Speech Area by designating it non-public. (Compl. ¶ 35.) Defendants also argue that Pierce's billboards permit students sufficient alternate methods of expressing themselves. (Mot. 16.) Placing a pamphlet on a billboard is a different medium of expression, and does not sufficiently permit students alternative channels of expression. *See Galvin v. Hay*, 374 F.3d 739, 750 (9th Cir. 2004) ("The Court has recognized that location of speech, like other aspects of presentation, can affect the meaning of communication and merit First Amendment

protection for that reason."). Last, Defendants argue that Board Rule 91005, which prevents the president of the college from approving rules that "would deny students their free speech rights were they conducting such activities in Free Speech Areas," provides students another avenue of communication. (Mot. 16.) However, this Rule is at odds with the Pierce policy, which does not provide any additional areas of expression, and, thus does allow Shaw other ways to express himself. Accordingly, Shaw adequately pleads this element, too, and the Court **DENIES** Defendants' Motion on these grounds.

### 3. Prior Restraint

The government may regulate expressive activity through reasonable permitting requirements to ensure equal access, and to maintain order. *See generally Forsyth Cty., Ga.*, 505 U.S. at 129–30. However, prior restraints come with a "heavy presumption" of invalidity. *Id.* at 130. Courts typically find permitting schemes unconstitutional where they are "contingent upon the uncontrolled will of an official—as by requiring a permit or license which may be granted or withheld in the discretion of such official." *Shuttlesworth v. Birmingham*, 394 U.S. 147, 151 (1969) (quoting *Staub v. City of Baxley*, 355 U.S. 313, 322 (1958)).

As described above, Shaw alleges that Pierce requires students to complete a permit application prior to using the Free Speech Area, and that the policy "does not limit the discretion of…administrators responsible for its enforcement, to deny or approve an application because of the content or viewpoint of the speaker's intended message." (Compl. ¶¶ 48–52.) Defendants claim that "the Pierce College administrators who process forms for use of the [Free Speech Area] *do not have any discretion* to deny a permit, other than on the grounds that the [Free Speech Area] has already been reserved by another speaker or group at the time requested." (Mot. 19 (emphasis in original).) Yet, Defendants cannot point to allegations in the Complaint, or anywhere in the regulations themselves that substantiate this argument. To the extent Pierce College actually has articulated standards for its administrators to follow

18

in deciding whether to grant students use of the Free Speech Area, Shaw has alleged otherwise (Compl. ¶¶ 48–52, 111, 122, 129), and the Court must take his allegations as true.  *Lee*, 250 F.3d at 688.  Thus, to the extent Pierce's policy does not provide "narrow objective, and definite standards to guide the licensing authority," it is invalid on its face.  *Forsyth Cty., Ga*, 505 U.S. at 131.

The permitting requirement also impermissibly restricts speech because it applies to all speakers regardless of whether applicants intend to speak alone or as part of a group.  (*See* Compl., Ex. C.)  Courts strike permitting requirements where they indiscriminately apply regardless of the number of speakers.  *Grossman*, 33 F.3d at 1206–07 (holding permitting ordinance overbroad where it swept in actions of single protestors).  These types of regulations are impermissible because they are not legitimately tied to the government's interests.  Where a large group of protestors may disrupt class, or impede foot traffic, the likelihood that a single protestor would do the same is low.  Furthermore, there are other, less restrictive avenues for the government to achieve its goals.  Accordingly, Shaw states a claim under this theory, too.

Finally, Shaw argues that having to identify himself during the permitting process is improper because it interferes with his right to anonymity.  (Compl. ¶¶ 48, 109; Opp'n 21.)  "[T]he requirement that potential speakers identify themselves to the government, and the concomitant loss of anonymity, is one of the primary *evils* the Supreme Court cited when it struck down the permitting requirement in *Watchtower Bible*."  *Berger v. City of Seattle*, 569 F.3d 1029, 1045 (9th Cir. 2009) (emphasis in original) (citing *Watchtower Bible & Tract Society v. Village of Stratton*, 536 U.S. 150, 166–67 (2002)).  Defendants argue that only administrators know of his identity, and therefore he maintains his anonymity with respect to individuals who may happen upon him while he is exercising his rights.  (Mot. 20.)  These facts are not contained in the Complaint, and thus not before the Court on this Motion.  Furthermore, in addition to anonymity, the permitting process precludes spontaneous speech because students must obtain a permit before speaking, even within the Free Speech Area.

(*See* Compl., Ex. C.)  Spontaneous speech is protected by the First Amendment.  *See Watchtower*, 536 U.S. at 167.  Accordingly, Shaw adequately pleaded the permitting process constitutes an unlawful prior restraint.

## C.  Failure to State a Claim: Section 1983 Causation

Defendants also move to dismiss on the grounds that Shaw's Second through Fifth causes of action do not sufficiently allege that Defendants caused Shaw's injury.  (*See* Mot. 8, 16–17.)  Defendants also argue these points in attacking Shaw's standing.

In an action under 28 U.S.C. § 1983, "[t]he requisite causal connection can be established not only by some kind of direct personal participation in the deprivation, but also by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury." *Johnson v. Duffy*, 588 F.2d 740, 743–44 (9th Cir. 1978).  A supervisor may also be liable under section 1983 where the supervisor's actions in implementing, promulgating, or advancing policies proximately cause plaintiff's harm.  *See OSU Student Alliance*, 699 F.3d at 1076–77; *see also Starr v. Baca*, 652 F.3d 1202, 1205–06 (9th Cir. 2011).

Here, Shaw alleges facts establishing each individual defendant's alleged role in violating his rights:

- Burke is the President of Pierce College, and is responsible for designating the Free Speech Area (Compl. ¶¶ 15, 36);
- Dixon-Peters is Vice President of Student Services, and students are required to consult him prior to distributing materials on campus to obtain a permit (*Id.* at ¶ 16, Ex. C, pg. 36);
- Marmolejo is Dean of Student Services, and was aware of Shaw's search for a copy of the free speech policy, and is responsible for "policymaking, administration, and enforcement of the college's policies and procedures, including those that were applied to…Shaw" (*Id.* at ¶¶ 17, 70–74); and

20

- Astorga is Dean of Student Engagement and specifically told Shaw that "[t]he use of the Speech area [was] under [his] purview." (*Id.* at ¶¶ 17, 74, 79–80.)

Shaw also argues that because he seeks injunctive relief, he "need only identify the law or policy challenged as a constitutional violation and name the official within the entity who can appropriately respond to injunctive relief." *Hartmann v. Cal. Dep't of Corr. & Rehab.*, 707 F.3d 1114, 1127 (9th Cir. 2013) (citations omitted). He has done so here. (Compl. ¶¶ 15–18.) Defendants do not respond to this argument. Accordingly, the Court **DENIES** Defendants' Motion on these grounds.

## D. Eleventh Amendment

Defendants move to dismiss Shaw's claims for monetary damages against the individuals in their official capacities. (Mot. 3–4.) Shaw concedes that he may not assert monetary claims against the individuals in their *official* capacities (Opp'n 9), but maintains he may pursue damages against them in their *individual* capacities. *Hafer v. Melo*, 502 U.S. 21, 30–31 (1991) (citing *Ex parte Young*, 209 U.S. 123, 238 (1908)) ("[T]he Eleventh Amendment does not erect a barrier against suits to impose 'individual and personal liability' on state officials under § 1983."). Accordingly, while Shaw may not pursue monetary damages against the individuals in their official capacities, he may do so to the extent his claims are against them in their individual capacities. However, as described below, the Court finds Defendants are entitled to qualified immunity, precluding a claim for monetary damages.

## E. Qualified Immunity

Defendants next argue that the Pierce College Defendants are entitled to qualified immunity to the extent they are sued in their individual capacities. (Mot. 22.) "Qualified immunity involves a two-step inquiry: (1) whether the [defendant's] conduct violated a constitutional right; and (2) whether that right was clearly established when viewed in the context of this case." *Ctr. for Bio-Ethical Reform, Inc. v. Los Angeles Cty. Sheriff Dep't*, 533 F.3d 780, 793 (9th Cir. 2008) (citing *Ganwich*

*v. Knapp*, 319 F.3d 1115, 1119 (9th Cir. 2003)). The Court addressed the alleged violation of Shaw's constitutional rights in the sections above, so the only remaining issue is whether Shaw's rights were "clearly established." *Id.* While there need not be "a case directly on point[,]…existing precedent must have placed the statutory of constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

Given the range of cases addressing the status of universities as public or non-public fora, and the differing classifications attributed to different aspects of a university's campus, the Court cannot make that finding here. Furthermore, while not determinative, as cited by Defendants, these regulations were litigated previously, albeit in a different context, with different results. *See Guengerich v. Baron*, No. 10-cv-01045-JHN-PLAx, 2011 WL 13116612, at *7 (C.D. Cal. May 5, 2011) (granting summary judgment and finding community college district's free speech policy did not violate the First Amendment rights of non-students). Accordingly, the Court **GRANTS** Defendants' Motion inasmuch as it requests dismissal of Shaw's claims for monetary damages against the individual defendants, Burke, Marmolejo, Dixon-Peters, and Astorga, in their individual capacities; Shaw's claim for injunctive relief, however, survives. *See, e.g.*, *Hydrick v. Hunter*, 669 F.3d 937, 939–40 (9th Cir. 2012).

**F.     Motion for More Definite Statement**

Defendants request a more definite statement, pursuant to Federal Rule of Civil Procedure 12(e), in their Notice of Motion. (Not. of Mot. 2.) However, they do not address this request in any detail in their papers. "A motion for more definite statement pursuant to Rule 12(e) attacks the unintelligibility of the complaint, not simply the mere lack of detail, and therefore, a court will deny the motion where the complaint is specific enough to apprise the defendant of the substance of the claim being asserted." *Beery v. Hitachi Home Elecs. (Am.), Inc.*, 157 F.R.D. 477, 480 (C.D. Cal. 1993). Shaw adequately pleads his Complaint such that Defendants will be able

to frame a responsive pleading, and therefore the Court **DENIES** Defendants' Motion on these grounds. *Famolare, Inc. v. Edison Bros. Stores*, 525 F. Supp. 940, 949 (E.D. Cal. 1981) ("A motion for a more definite statement should not be granted unless the defendant cannot frame a responsive pleading.").

## V. CONCLUSION

As set forth more fully above, the Court **DENIES, in part, and GRANTS, in part,** Defendants' Motion to Dismiss, and for a more definite statement. (ECF No. 22.)

**IT IS SO ORDERED.**

January 17, 2018

_____
**OTIS D. WRIGHT, II
UNITED STATES DISTRICT JUDGE**